**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TERRY A. PIERCE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 11 C 4157 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Terry A. Pierce, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and 1382c(a)(3)(A). Ms. Pierce asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**
**PROCEDURAL HISTORY**

Ms. Pierce applied for DIB on June 21, 2007, alleging that she has been disabled since March 13, 2006, due to a lower lumbar injury (Administrative Record ("R") 17). Her application was denied initially on November 21, 2007, and upon reconsideration on March 7, 2008. (R. 14). Ms. Pierce then filed a timely request for hearing in pursuit of her claim on April 7, 2008. (R. 14).

An administrative law judge ("ALJ") convened a hearing on July 16, 2009, at which Ms. Pierce, represented by counsel, appeared and testified. (R. 32-75). At this hearing, Pamela Tucker testified as a vocational expert. (R. 75-85). On August 14, 2009, the ALJ issued an unfavorable decision, denying Ms. Pierce's application for DIB. (R. 11-23). This became the Commissioner's

final decision when the Appeals Council denied Ms. Pierce's request for review on April 18, 2011. (R. 1). Ms. Pierce has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Ms. Pierce was born on July 7, 1954, making her fifty-five years old at the time of the ALJ's decision. (R. 32-33). She lived in a house she was renting. (R. 33). She completed high school, but has no other vocational or specialized training. (R. 33). Ms. Pierce has worked part-time for a school lunchroom program as a cashier since January 2007. (R. 39). She only works during the school year for about four to five hours a day. (R. 34-36). Prior to that, she held positions as a cashier and in customer service with other employers. (R. 39-46).

### B.
### The Medical Evidence

Ms. Pierce contends that she is eligible for disability and DIB due to a lower lumbar injury, which prevents her from being able to sit, stand, lift or bend for long periods of time. (R. 17). She claims that the injury hinders her sleep and causes numbness in her legs. (R. 17). As a result of these symptoms, she alleges as of March 13, 2006, she has been unable to work longer than 4 to 5 hours without pain. (R. 17).

Ms. Pierce originally injured her back in October 2004 while she was working as a waitress. (R. 17, 44). She hurt it when she was moving full cases of drinking glasses from one rack to

another. (R. 44-45).

Her employer paid for her treatment, which included chiropractic manipulations, cold and hot pads, and pain medication. (R. 17-18, 46-48). In addition to seeing a chiropractor, Ms. Pierce also underwent physical therapy. (R. 18, 47). At first her back improved and she returned to work. (R. 18, 53, 227). Her doctor's notes indicated that she could ambulate and heel and toe walk without any difficulty, and that her range of motion in her spine was completely normal. (R. 18, 227). An epidural steroid injection was not ordered because Ms. Pierce seemed to be improving. (R. 18, 227). Surgery was not recommended. (R. 18, 47, 227). During this time, the doctor limited Ms. Pierce to lifting no more than 40 pounds and stated she should limit repeated bending, stooping, or twisting if possible. (R. 18, 48, 227). The doctor also recommended that Ms. Pierce begin a work hardening program. (R. 18, 227).

Ms. Pierce returned to work because her back was improving, but she testified that her condition quickly deteriorated and she could no longer sit or stand comfortably. (R. 18, 54). She therefore quit her job in March 2006. (R. 18, 53-54). She discontinued treatment because of lack of insurance but continued to take pain medication and do home therapy. (R. 48)

In April of 2006, EMG results were completely normal, as there was no electrodiagnostic evidence of any neuropathy or radiculopathy. (R. 19, 255-59). An MRI was also taken of Ms. Pierce's back that noted a small disc protrusion at L5-S1 but no neural compression. (R. 19, 328). There was also mild disc bulging at the T11-12, L2-L3, and L4-L5 levels, with spondylosis at T11-12 and L2-L3. (R. 19, 328). The physician indicated that the claimant's back impairment caused more than 50% reduction in her capacity to bend, stand, and stoop. (R. 19, 330). The treating physical indicated that she was being treated for a lumbar disc strain. (R. 19, 331). Ms. Pierce did

not return to work. (R. 19, 331).

In November of 2007, Ms. Pierce underwent a consultative physical examination in connection with her application for benefits. Dr. Chukwuemeka Ezike concluded that she was able to walk more than 50 feet without any support, and that her range of motion in both her cervical and lumbar spine was completely normal with only mild pain. (R. 19, 275). Her straight leg test was negative bilaterally, she was able to toe/heel walk, and she was able to get on and off of the examination table without any noticeable difficulty. (R. 19, 276). Furthermore, Ms. Pierce's Rombeg test was negative and there were no neurological deficits of any kind. (R. 19, 276).

In February 2008, Ms. Pierce had a physical therapy evaluation. Lumbar range of motion was 90% forward bending and right side bending and 50% left side bending. (R. 19, 344). The physician noted there was a slight restriction in mid-lower lumbar passive mobility, and negative straight leg raising tests bilaterally. (R. 19, 344).

The examination notes of April 2008 briefly mentioned Ms. Pierce's lower back pain but stated that she was still on pain medication. (R. 20, 297). The exam notes from June 2008 stated that she had back pain only intermittently. (R. 20, 301). In July 2008, it was noted that the claimant's back pain improved with the use of pain medication, specifically Amitryptyline. (R. 20, 303). Additionally, in August 2008, Ms. Pierce was actually advised by her treating physician to exercise for 20-30 minutes, three times a week. (R. 20, 308). Through June of 2009, there were several more minimal and unremarkable findings and recommendations that were made. (R. 20, 309-326).

## C.
## The Administrative Hearing Testimony

# 1.
## Ms. Pierce's Testimony

Ms. Pierce testified that she has a high school education and presently worked as a cashier at a school lunch program. (R. 33). She started working at the school around January 2007. (R. 39). She testified that she starts at 9 o'clock in the morning and usually works until 1:30 in the afternoon. (R. 35). She works part time for about four to five hours a day, although there are some days where she stays longer by about an hour or hour and a half. (R. 34, 36, 61). During the school year, she works Monday through Friday except for the days school is not in session. (R. 34, 58). She does not work during summer break. (R. 34).

She testified that in the morning she makes the sandwich wraps until a little after 10 o'clock when she then opens the serving line. (R. 37). She testified that there is no heavy lifting involved in any of her duties. (R. 38). Although she stated she is able to lift 15-20 pounds comfortably, the heaviest item she has to lift is a gallon of mayonnaise, which she thought only weighed "a couple of pounds maybe." (R. 38, 61). When asked about how much weight she has to lift at her job, she stated that there is nothing at her current place of employment that would require her to lift more than 20 pounds and that she does not have to carry any weight. (R. 61).

At her job she has the freedom to stand and sit as needed. (R. 57). She testified that her employer provided a stool for her in an effort to accommodate her back pain. (R. 58). Additionally, she stated that there is a milk crate underneath the register where she stands so that she can alternate her legs and shift her weight. (R. 57). Her accommodations are unique to her needs because the other cashier at the end of the cafeteria does not have the specific accommodations that Ms. Pierce has been provided. (R. 58). Ms. Pierce testified that she does a little bit more sitting than standing or

5

walking, and that standing gives her the most trouble because her legs go numb. (R. 59-60). She stated that as the day goes on it becomes more difficult for her to stand. (R. 59).

She testified that after a "rough" day she will be sore and "crunched over" by the time she gets home. (R. 62). She usually ends up taking a warm shower and putting ice packs on her body in order to remedy the pain. (R. 62). She said that working at her part-time job is as much as she can handle without hurting herself again, and believes that she would not be able to do the same work for eight hours, five days a week. (R. 75) Ms. Pierce also testified that she had no other conditions that kept her from working. (R. 53).

In regards to her daily activities, Ms. Pierce stated that her injury does not prevent her from performing basic self-care, although it is done at a slower pace. (R. 205). Furthermore, she completes her housework for much of the day. (R. 51). She also visits with her children and grandchildren, often baby sitting her grandchildren who ranged in ages from one to seven at the time of testimony. (R. 51-52). For recreation, she watches television and crochets. (R. 52). Her traveling is limited, but she flew to Arkansas to visit with her son. (R. 52). She stated that she does perform exercise for her back and has been instructed to walk twenty to thirty minutes three times a week. (R. 68). The exercises consist of Ms. Pierce laying on her bed, lifting up her legs and bringing them to her chest and then moving them from side to side. (R. 68). She also incorporates a medicine ball into her exercises. (R. 68).

Ms. Pierce testified that she injured herself in October of 2004. (R. 44). As a result of this injury she received Workers' Compensation benefits, which consisted of a cash settlement and physical treatment. (R. 46). At the time surgery was not recommended. (R. 47). She was, however, discharged with certain restrictions. (R. 47). She claimed the doctor limited her to working no more

than four to five hours a day, no heavy lifting and to alternate standing and sitting. (R. 47). She was also prescribed pain medication and instructed to continue with home therapy, which she still continues to do. (R. 47-49). Ms. Pierce testified that her back pain did improve after she was discharged. (R. 53). Ms. Pierce stated that she did not go back for further physical treatment because she did not have health insurance nor the adequate finances to do so. (R. 48). She testified that she continued to take the pain medication that was prescribed to her by her doctor, in addition to medication that she received from a friend. (R. 49-51). Currently, she takes Naprosyn, Ibuprofen, and Ultrams for the pain and Amitriptyline to help her sleep. (R. 49-51). She testified that she attempts to limit the intake of her pain medication to only times when she is "going to be doing something that's going to really irritate [her] back." (R. 50). However, she testified that she ended up taking it every day when she worked in the school lunchroom and even when she was not working. (R. 51).

Ms. Pierce stated that the condition of her back worsened when she attempted to work at the Victorian Village in their small convenience store, which sold personal items and gifts. (R. 54). She described her job duties to consist of waiting on customers and running the cash register. She stated that her "back blew out again" and that she "couldn't sit or walk hardly." (R. 54). She left that job in March 2006 and collected short-term disability for a while. (R. 54). She then began working at the school around Christmastime in December 2006 or January 2007. (R. 55). Around that same time she also obtained a job at Subway. She attempted to work at Subway at night and on the weekends because she worked at the school during the day. (R. 56). After about three months at Subway she left because she felt that the "Subway job consisted of a lot of things that [she] thought [she] could do and [she] found out [she] couldn't do and it was getting [her] back sore again." (R. 56).

Ms. Pierce explained that reinjuring her back caused a financial hardship upon her. (R. 54). "I was losing everything. I had lost my place I lived in. I lost my van. I had no finances whatsoever." (R. 54-55). She testified that her son decided that she needed to move down to Benton, Arkansas, to live with him because of her financial state. (R. 55). She was only there for a month, however, before she moved back to Joliet and stayed with a friend and his family from August 2006 until February 2007. (R. 55). At that point, she was able to find a place to live on her own. (R. 55). She currently rents a small house, but she has to borrow money from people, in addition to receiving help through the township, in order to pay for the rent. (R. 34, 55).

## 2.
### The Vocational Expert's Testimony

Ms. Tucker then testified as a vocational expert. (R. 75-85). In response to the ALJ's hypothetical, she testified that an individual of advanced age, and who is limited to light work with only occasional bending, stooping and twisting would still be able to perform Ms. Pierce's past work of a salesclerk, cashier, and a waitress. (R. 77-78). Each of these jobs was categorized as semi-skilled and light work, and they had a specific vocational preparation (SVP) code of three.[1] (R. 77-78). However, Ms. Tucker testified that if the individual would need to alternate between sitting and standing, they would not be able to perform Ms. Pierce past work. (R. 78).

Ms. Tucker testified that there are cashier cafeteria positions that allow for the sit/stand option as Ms. Pierce performed it. (R. 78). Ms. Tucker explained that Ms. Piece did not just sit at the cash register. (R. 79). She noted that Ms. Pierce cooked food, served the food, in addition to operating the cash register, which allowed for the sit/stand option. (R. 79). She stated that there

---

[1] The SVP is an estimate of the amount of time it takes to learn a job. A level 3 position takes one to three months to learn. http://www.onetonline.org/help/online/svp.

would normally be 40,000 other cashier positions that the individual could perform, but 12,000 that would allow for a sit/stand option. (R. 79). Ms. Tucker pointed out that this position would only be a SVP two. (R. 80). The ALJ then asked if there would be any work in the cashier field that Ms. Pierce could do with those restrictions with an SVP three or higher. (R. 80). Ms. Tucker responded that when looking at positions available with a SVP three there would be approximately 4,000 cashier-checker positions, which reflect the skills gained in previous employment and take into account the sit/stand option. (R. 82). Additionally, Ms. Tucker testified that there are approximately 900 jobs in the region as an information clerk with a SVP four, which would utilize the customer service skills that were gained in previous employment and take into account the sit/stand option. (R. 82-83).

## III.

## THE ALJ'S DECISION

The ALJ found that Ms. Pierce's back impairments "likely do impact her ability to perform basic work activities," but "they do not preclude the performance of work altogether." (R. 21). The ALJ noted that although the medical findings indicated that Ms. Pierce had been consistent in her complaints regarding her symptoms, the ALJ did not believe the findings are so limiting to prevent her from performing work activities on a regular and continuing basis. (R. 19). The ALJ held that Ms. Pierce does not have an impairment or combination of impairments that meets or equals one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1, giving particular consideration to listing 1.04 for disorders of the spine. (R. 17). The ALJ took into account each objective medical finding and ruled that, although Ms. Pierce's treating physicians made some references that her back pain would prevent her from returning to work, there was very little objective support for this

conclusion. (R. 20). The ALJ stated that the physicians relied on the subjective complaints of Ms. Pierce rather than the objectively quantifiable medical findings. (R. 20). The ALJ concluded that Ms. Pierce exhibited only minor degenerative changes in her spine, but that she maintained a wide range of motion. (R. 20). In April of 2006, Ms. Pierce underwent an EMG and the results came back completely normal. (R. 19). An MRI of her spine did note a small disc protrusion but there was no neural compression. (R. 19). In arriving at these findings, the ALJ gave little weight to the opinions of Ms. Pierce's treating physicians. (R. 20).

The ALJ further supported his reasoning that Ms. Pierce's limitations are not as severe as she alleges by looking at the findings of her consultative exams. (R. 20). In November 2007 the ALJ stated that the examination's findings were "unremarkable." Ms. Pierce had full range of motion and only mild pain. Her physician noted that she could lift up to 20 pounds. (R. 19). In February 2008, the physician concluded that Ms. Pierce had 90% forward bending and right side bending and 50% for the left side bending. The physician stated there to be only a "slight restriction." (R. 19). The ALJ noted that in April 2008 the exam notes briefly mentioned Ms. Pierce's back pain. (R. 20). In June 2008, the exam notes that she only has back pain "intermittently." (R. 20). Also in July 2008, it was noted that her back pain was actually improving because of her pain medication. (R. 20). Additionally in August 2008, Ms. Pierce was actually advised to exercise for 20-30 minutes, three times a week. (R. 20). The ALJ stated that the fact that Ms. Pierce's treating physician believed that she was capable of such exercise was a "further indication" that her pain was not disabling. (R. 20). The ALJ stated that there were other "similar minimal and unremarkable findings" made by treating doctors through June 2009. (R. 20). Ultimately, the ALJ found that Ms. Pierce has the residual functional capacity to perform light work

as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except she can only occasionally bend, stoop, or twist and must have the option to sit or stand at will. (R. 17).

Moreover, the ALJ held that the fact that Ms. Pierce is even able to continue doing her current job is demonstrative of an ability to engage in greater exertion that she alleges she is capable. (R. 20). The ALJ reasoned that although Ms. Pierce is only scheduled to work for four to five hours a day, she often works longer. (R. 20). She has been given the sit or stand option at work, and the ALJ held that if she were given this option in any other job that she could perform, the objective record demonstrates that she would be able to work on a regular and continuing basis. (R. 20). The ALJ also noted that Ms. Pierce regularly does exercises for her back. (R. 20). She was allowed to lift up to 40 pounds but told that she could not go to work. (R. 20). The ALJ held that these facts demonstrate that Ms. Pierce's allegations of disabling pain were not credible. (R. 20).

The ALJ also took into account an assessment conducted by a State agency disability examiner in November 2007, which held that Ms. Pierce was capable of performing a full range of work at the medium exertional level. (R. 20). However, the ALJ did not give this much weight because of additional evidence that was submitted after this assessment, which indicated that Ms. Pierce was more limited than the examiner concluded. (R. 20).

The ALJ ruled that Ms. Pierce is unable to perform past relevant work. (R. 21). He mentioned that the vocational expert testified that although Ms. Pierce has the capacity to perform work at a light level, her past relevant work would not allow for an option to sit or stand. (R. 21). Therefore, her past work exceeds her residual functional capacity. (R. 21). However, the ALJ recognized that Ms. Pierce acquired work skills from her past positions. (R. 21). The ALJ noted that she would be able to perform as a cashier-checker or an information clerk. (R. 22). Both these

positions utilize the customer service skills gained in previous employment. (R. 22). Further, the cashier-checker position reflects the cashier skills gained from previous jobs. (R. 22). The ALJ acknowledged that Ms. Pierce would not be able to perform the full range of light work because of her additional limitations. (R. 22). However, regardless of these limitations, the ALJ reasoned that the Ms. Pierce is capable of making successful adjustments to work that exists. (R. 22). Ultimately, when considering these factors and taking into account Ms. Pierce's additional limitations, the ALJ ruled that there are jobs existing in significant numbers in the regional economy, and by extension, the national economy that Ms. Pierce has the ability to perform. (R. 22). Thus, the ALJ concluded that as a result Ms. Pierce was not disabled under the Act. (R. 22).

## IV.
## DISCUSSION

### A.
### The Standards Of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d 503, 513-14 (7th Cir. 2009); *Adams v. Astrue*, 2012 WL 3065299 (N.D. Ill. 2012). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).

In these cases, the standard of review is deferential and the court may not reweigh the evidence, make independent credibility determinations, or substitute its judgment for that of the

ALJ.  *Weatherbee v. Astrue*, 649 F.3d 565,568 (7th Cir. 2008); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Where conflicts arise, it is the ALJ's responsibility to resolve those conflicts.  *Simila*, 573 F.3d at 513-14.  Even if reasonable minds may differ as to whether the plaintiff is disabled, the court must affirm the ALJ's decision if it is supported by substantial evidence.  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).  However, legal conclusions are not entitled to such deference and, if the ALJ commits an error of law, the decision must be reversed.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports his ultimate conclusion.  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review.  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696,698 (7th Cir. 1994).  The ALJ must "minimally articulate" the reasons for his ultimate conclusion by building a "logical bridge" between the evidence and the ALJ's conclusion.  *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996).  This is a "lax" standard.  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

## B.
## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1)      is the plaintiff currently unemployed;

2)      does the plaintiff have a severe impairment;

3)      does the plaintiff have an impairment that meets or equals one of the impairments

        listed as disabling in the Commissioner's regulations;

4)      is the plaintiff unable to perform his past relevant work; and

5)      is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d at 512-13; *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step three, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must then present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. *Weatherbee*, 649 F.3d at 569; *Briscoe*, 425 F.3d at 352.

## C.
### Analysis

Ms. Pierce advances four arguments for reversal or remand. First, she argues that the ALJ failed to identify support in the record for his finding that she could perform the physical requirements of light work on a full-time, continuous basis. Second, she contends that there were numerous factual and legal errors in the ALJ's credibility assessment. Third, Ms. Pierce claims the ALJ erred by not mentioning or assessing the impact of Ms. Pierce's obesity in contravention of Social Security Ruling 02-1p. Finally, Ms. Pierce submits that the ALJ did not properly weigh the opinion evidence from treating source, Dr. Duarte, in accordance with the Social Security

14

Administration's regulations. (*See* Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security, 1)("Plaintiff's Brief").

### 1.

Ms. Pierce's contention that the ALJ did not put forth record support for the finding that she could perform light work on a continuous basis (*Plaintiff's Brief*, at 6-7) is unpersuasive.

The residual functional capacity (RFC) assessment is a consideration of the tasks the claimant can physically accomplish in order to determine the level of work that can be performed. 20 C.F.R. § 404.1545(a)(1); *Berger v. Astrue*, 516 F.3d 538, 544 (7th Cir. 2008). When reviewing the ALJ's RFC assessment of the claimant, the reviewing court does not reweigh the evidence or substitute its own analysis for the ALJ's. *Id.*; *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). The ALJ's finding will be affirmed when there is substantial evidence to support that decision. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). "Substantial evidence" must be more than a mere scintilla but it does not need to be a preponderance. *Id.* at 841-42. In the ALJ's decision, it need not elaborate in intricate detail the evaluation and determination of every item in the record, but only so much as to allow a reviewing court to "trace the path of the ALJ's reasoning." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Here, the ALJ did provide sufficient reasoning for the reviewing court to "trace the path of the ALJ's reasoning." *Id.*

Ms. Pierce relies on *Scott v. Astrue*, 647 F.3d 734(7th Cir. 2011), which held that the ALJ failed to build the requisite "logical bridge" between the evidence and its holding. *Plaintiff's Brief*, at 6. That court reasoned that the ALJ simply said her conclusion is based on a doctor's examination, but failed to state why she relied on the doctor's examination. *Scott*, 647 F.3d at 740. That court noted that nothing in the doctor's examination supports the plaintiff's ability to lift 20 pounds. *Id.*

Essentially, the ALJ did not identify any medical evidence to substantiate her conclusion that the plaintiff is capable of meeting those physical requirements. *Id.*

However, unlike *Scott*, the ALJ in this case did point out specific medical evidence to support his conclusion that Ms. Pierce can perform light work on a continuing basis. The ALJ recognized that Ms. Pierce's treating physician made reference that her back pain would prevent her from returning to work, but the ALJ reasoned that there was little objective support for this conclusion. (R. 19-20). A treating physician's opinion about the nature of the claimant's injuries receives controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "consistent with substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The ALJ noted that Ms. Pierce still had a wide range of motion and that although she had minor degenerative changes in her spine, she was not suffering from a more severe pain-causing disorder such as neuropathy or radiculopathy. (R. 20). The treating physician's opinion may also be unreliable if the physician is sympathetic with the claimant and thus "too quickly find[s] disability." *Ketelboeter v. Astrue*, 530 F.3d 620, 625 (7th Cir. 2008); *Schmidt*, 496 F.3d at 842. The ALJ stated that the treating physician relied too much on Ms. Pierce's subjective complaints and not enough on the objective medical evidence. (R. 20). *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012)("ALJs may discount medical opinions based solely on the patient's subjective complaints . . . ."); *Ketelboeter*, 550 F.3d at 625 (if the treating physician's opinions appear to be based on the claimant's subjective complaints, the ALJ may discount it).

The ALJ demonstrated through specific examination notes why he did not believe Ms. Pierce's symptoms are so limiting as to prevent her from performing basic work actives on a regular

and continuing basis. (R. 19). In April 2008 the examination note only briefly mentioned Ms. Pierce's lower back pain. (R. 20). Furthermore, in June 2008 the exam notes state that her back pain is only intermittent, and in July 2008 Ms. Pierce's back pain had actually improved with the use of Amitryptyline. (R. 20). Additionally, in August 2008 Ms. Pierce was advised to exercise 20-30 minutes at a time, three times a week. (R. 20). The ALJ noted that several other unremarkable findings were made all the way through June of 2009. (R. 20). An ALJ is entitled to find a claimant has exaggerated her limitations when the objective medical evidence fails to support the extent of her complaints. *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). The ALJ also reasoned that the treating physician's recommendation that Ms. Pierce engage in exercise was an indication that her back pain is not disabling, and the treating physicians finding that she could not return to work is unreliable. (R. 20).

Moreover, the ALJ also took into account Ms. Pierce's ability to continue working in the school cafeteria. (R. 20). The ALJ reasoned that she has the "ability to engage in greater exertion than stated in her subjective allegations." (R. 20). The ALJ also noted that Ms. Pierce often ends up working longer than four to five hours, tending to support a finding that Ms. Pierce could work on a full-time basis. Additionally, at her job she has the option to sit or stand, which the ALJ reasoned that if she is given this option at another job she could perform work on a regular and continuing basis. While employment is "not proof positive" that someone is not disabled, *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995), the ALJ did not rely on Ms. Pierce's ability to work as exclusive support for his credibility finding. He combined it with the objective medical evidence.

Therefore, contrary to Ms. Pierce's allegations, the ALJ properly explained his finding that she could perform light work on a continuous basis. His assessment reveals that, although Ms.

Pierce's symptoms may be limiting, they are not so as to prevent her from performing basic work activities on a regular basis. (R. 19).

2.

Ms. Pierce's second contention is that the ALJ's credibility determination was against policy and case law. She argues that the ALJ merely stated in conclusory fashion that Ms. Pierce was not credible. (*Plaintiff's Brief* pg. 8). Ms. Pierce is correct that the ALJ "must make a credibility determination of a plaintiff's testimony regarding symptoms" in accord with 20 C.F.R. §§ 404.1529, and from the record, that is precisely what the ALJ did in concluding that Ms. Pierce's claimed degree of limitation was not credible. (*Plaintiff's Brief*, pg. 8).

The ALJ is not bound to give credit to a complainant's complaints if they clash with other objective medical evidence in the record or the credibility is otherwise called into question. *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). When taking into account the appropriate evidence, including objective medical reports and self-reports, the ALJ is looking for discrepancies between such evidence in order to determine if the complainant is exaggerating her ailments. *McKinzey* , 641 F.3d at 891; *Jones*, 623 F.3d at 1161; *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2007). .

A reviewing court lacks direct access to witnesses, the trier of fact's immersion in the case as a whole, and the specialized tribunal's experience with the type of case under review. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Because of the ALJ's advantages in these areas, his credibility determination is entitled to special deference. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010); *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). The ALJ's determination can be reversed only if it is "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Demonstrating that the

ALJ's credibility determination is patently wrong is a "high burden." *Turner v. Astrue*, 390 Fed. Appx. 581, 587 (7th Cir. 2010). To carry that burden, a claimant must demonstrate that the determination lacks any explanation or support. *Jones*, 623 F.3d at 1160-62.

In making judgments about the veracity of a claimant's statements about his or her symptoms, the ALJ, in addition to considering the objective medical evidence, should consider the following in totality: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (4) the type, dosage, effectiveness and side effect of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995); *Adams v. Astrue*, 2012 WL 3065299, *8 (N.D. Ill. 2012).

Ms. Pierce argues that the ALJ employed a credibility template that the Seventh Circuit has repeatedly criticized as "meaningless," *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010), "unhelpful," *Shauger v. Astrue*, 675 F.3d 690, 696-97 (7th Cir. 2012), and "opaque." *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012). The court explained that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson*, 671 F.3d at 645-46.

Use of this "template," unfortunately and inexplicably continues to be seen in decisions of ALJs. But its use, while insufficient to support a credibility finding, does not make a credibility determination invalid. *Richison v. Astrue*, 2012 WL 377674, *3 (7th Cir. 2012); *Adams v. Astrue*,

2012 WL 3065299, *9 (N.D. Ill. 2012). The failure to support a credibility determination with explanation and evidence from the record does. *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011). Here, the ALJ however, went beyond the template and carefully explained how Ms. Pierce's claimed "allegations of disabling pain are not entirely credible." (R. 20).

The ALJ reasoned that the objective medical findings "support the finding that the claimant's limitations are not as intense as she alleges." (R. 20). The ALJ pointed out that the examination notes from April 2008 only briefly mention that Ms. Pierce has lower back pain, and the examination notes of June 2008 state that she only has pain intermittently. (R. 20). It was noted in July 2008 that her back pain was improving with the use of Amitryptyline. (R. 20). The ALJ noted that there were similar "unremarkable findings and recommendations" made by her treating physician all the way through June of 2009. (R. 20). He also took the fact that Ms. Pierce's treating physicians believed she was capable of exercising as an indication that her pain was not disabling. (R. 20). The ALJ concluded that the treating physicians were relying too heavily on Ms. Pierce's subjective complaints rather than allowing for the objective medial findings to demonstrate the severity of her claim. (R. 20). That's a valid line of reasoning. *Filus*, 694 F.3d at 868; *Ketelboeter*, 550 F.3d at 625  *See supra*.

The ALJ reasoned that, at most, Ms. Pierce suffered from minor degenerative changes in her spine, but recognized that she has maintained a relatively wide range of motion. (R. 20). Ms. Pierce is not suffering from a more severe pain-causing disorder, such as neuropathy or radiculopathy. (R. 20). These objective medical findings confirmed that the limitations Ms. Pierce claimed were not as acute as she alleges. (R. 20). *See Jones*, 623 F.3d at 1161 (holding that the discrepancy in objective medical evidence and subjective complaints showed that the claimant was exaggerating

their symptoms).

Furthermore, Ms. Pierce currently performs exercises for her back. She lies on her bed, lifts her legs up to her chest and then moves them side-to-side. (R. 20). She usually uses a weighted gravity ball to assist with the exercises as well. (R. 20). Along with the foregoing, her ability to complete these exercises demonstrated to the ALJ that her allegations of disabling pain were not reliable. (R. 20). *See Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008) ( ALJ provided valid reasoning for his adverse decision which included the fact that the claimant participated in aquatic-exercise classes and regular walking throughout the week).

Although, the ALJ's decision may contain some boilerplate language and it is not entirely perfect, it is still not "patently wrong." See *Kittleson v. Astrue*, 363 Fed. Appx. 553, 557 (7th Cir.2010)("The ALJ's adverse credibility finding was not perfect. But it was also not 'patently wrong.'"); *Scheck*, 357 F.3d at 703 ("The credibility determinations of an ALJ are entitled to special deference and we see no reason to overturn her findings."). The ALJ reviewed Ms. Pierce's testimony and compared her complaints with the objective medical evidence in the record. He properly found that Ms. Pierce's claimed limitations were inconsistent with the medical evidence and her daily activities. The ALJ factored in Ms. Pierce medication and other treatments, such as her at-home exercises. The conclusion that the ALJ arrived at was well founded and his explanations were given. Consequently, it ought not be disturbed.

### 3.

Ms. Pierce further criticizes the ALJ for failing to consider her obesity. *Plaintiff's Brief*, pg.

2, 13-14). Social Security Ruling 02-1p states that obesity should be used in determining whether the claimant's impairments meet the requirements of the Commissioner's regulations. *SSR* 02-1p. However, even though SSR 02-1p requires that the ALJ consider obesity, a failure to do so may be harmless, *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *Moore v. Astrue*, 851 F.Supp.2d 1131, 1145 (N.D. Ill. 2012), particularly when a claimant fails to specify how the obesity further impaired her ability to work. *Skarbek*, 390 F.3d at 504; *Moore*, 851 F.Supp.2d at 1145.

Here, Ms. Pierce says nothing about how her weight affected her ability to work. Her medical records did note that she had a body mass index ("BMI") of 30, but these observations are without further comment. This omission is not likely to have occurred if the doctors or Ms. Pierce thought the obesity affected or exacerbated her condition. The ALJ specifically asked Ms. Pierce whether she had any other conditions that would in some way "get into the way of your being able to work." (R. 53). Ms. Pierce responded that she had high blood pressure, but that this did not keep her from working. (R. 53). She never mentioned her obesity or any other condition which kept her from working or exacerbated her injuries.

Ms. Pierce did not sustain her burden to articulate the way her obesity exacerbated her underlying conditions. *Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504. Where the claimant, herself, is silent on this issue, the Seventh Circuit has repeatedly excused an ALJ's failure to explicitly address the claimant's obesity as harmless error, so long as the ALJ demonstrated that he reviewed the medial records of the doctors who are familiar with the claimant's obesity. *Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504. As the ALJ's discussion of the evidence demonstrates here, he did review the medical records of the doctors who were familiar with Ms.

Pierce's BMI. (R. 19-20).

Therefore, taking into account Ms. Pierce's failure to satisfy her burden of articulating the effects of her obesity and her overall silence on the issue, this was a harmless error and does not require a remand.

**4.**

Ms. Pierce's final contention is that the ALJ did not properly weigh the opinion evidence from treating source, Dr. Duarte. *Plaintiff's Brief*, pg. 2, 14-15. She argues that the ALJ did not give an explanation for his conclusion that the objective evidence did not support Dr. Durant's opinion. *Plaintiff's Brief*, pg. 15. Furthermore, she argues that the ALJ did not state any rationale to support his assertion that exercising for 20-30 minutes several times a week was inconsistent with Dr. Duarte's opinion. *Plaintiff's Brief*, pg. 15. Contrary to Ms. Pierce's contentions, the ALJ did provide adequate explanation for his holding that there was little objective support for Dr. Duarte's opinion. Also, Ms. Pierce is mistaken in her argument that the ALJ stated exercising was inconsistent with Dr. Duarte's limitations.

The ALJ noted that in 2006, Dr. Duarte, advised Ms. Pierce not to return to work because she had a lumbar disc strain. (R. 19, 331). However, the ALJ found little objective support that her back pain would prevent her from continuing her work. (R. 19-20). The ALJ took into account the MRI results, which showed that Ms. Pierce was exhibiting only minor degenerative changes in her spine, and the ALJ noted that she was not exhibiting a more severe disorder such as neuropathy or radiculopathy, which would cause her more pain and is a more severe pain-causing disorder. (R. 20). The ALJ also noted that according to the objective medical findings, Ms. Pierce still maintained a relatively wide range of motion. (R. 20). Furthermore, the ALJ held that the findings of Dr. Ezike

confirmed that Ms. Pierce's back impairment was not as limiting as alleged. (R. 20).

The ALJ reviewed, for example, several of Dr. Ezike's examination notes that reflected unremarkable findings. Dr. Ezike found that Ms. Pierce could sit or stand for 30 minutes at a time and could lift up to 20 pounds. (R. 19). Dr. Ezike also noted that Ms. Pierce did not have any neurological defects and that her range of motion in both her cervical and lumbar spine were completely normal with only mild pain. (R. 19). In addition, her straight leg testing was negative bilaterally, she was able to perform toe/heel walk, and get on and off of the examination table with no apparent difficulty. (R. 19). The ALJ explained that these facts do not indicate that Ms. Pierce's pain is so severe and limiting that she cannot return to work. (R. 19-20).

The ALJ clearly weighed the objective medical findings with the opinions established by Dr. Duarte and found that because of the discrepancy between the opinions of the treating sources and the objective medical evidence, the ALJ gave little weight to the treating source's opinion. *See Ketelboeter*, 550 F.3d at 625 (if the treating physician's opinions appear to be based on the claimant's subjective complaints, the ALJ may discount it).

Moreover, Ms. Pierce argues that the ALJ did not set forth his rationale to support the finding that walking 20-30 minutes several times a week was inconsistent with Dr. Duarte's opinion. *Plaintiff's Brief*, pg. 15. This argument is flawed because the ALJ never asserted that exercising proved inconsistent with the doctor's opinion, he stated that it was a "further indication" that the doctor did not find Ms. Pierce's pain to be disabling. (R. 20). Also, this was a "further indication" to the ALJ that the doctor was not relying on objective medical evidence so much as on Ms. Pierce's subjective complaints. (R. 20). This, coupled with other examination notes and objective medical evidence, supported the conclusion that there was little objective support for such a limiting

diagnosis. (R. 20). *See Elder*, 529 F.3d at 414 (weighing the fact that the claimant participated in aquatic-exercise classes and regular walking throughout the week to conclude that the claimant was not disabled).

## CONCLUSION

The plaintiff's motion for remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 1/14/13